JOHN H. BUCKLEY, petitioner-appellant,

*v.*

EDITH BUCKLEY, defendant-respondent.

[Decided April 4th, 1924.]

The judges being equally divided on the question whether the judgment should be reversed, the judgment is affirmed solely because of such division, which renders any opinion by the court impossible.

On appeal from the court of chancery advised by Advisory Master Charles V. D. Joline, who filed the following conclusions:

"The petition in this case was filed on November 29th 1920. In paragraph 2 it alleges that the defendant deserted the petitioner on or about December 13th, 1901, and that said desertion has been willful, continued and obstinate for more than two years last past. Section 3 alleges that the petitioner has been a *bona fide* resident of the State of New Jersey continuously since on or about January 1st, 1915.

"The defendant was not served with process, but was brought into court by publication. On December 13th, 1920, an order was made that paragraph 2 of the petition be amended so that it should read that 'from January, 1915, to the date of filing the petition herein, and for two years next preceding the filing of the petition herein, the defendant willfully, continuedly and obstinately deserted the petitioner,' and on December 13th, 1920, the amended petition was filed.

"On March 15th, 1921, the cause was referred to a special master, and on June 2d, 1921, a report was filed, advising a decree of divorce for the reason that the desertion became willful, continued and obstinate on or about the month of January, 1915. If this be true, the desertion must have occurred on or before January, 1913.

"In substance, the evidence is as follows: The petitioner was married to the defendant in April, 1893 or 1894. He went to Wassaic, New York, in April, 1897, and from there to Tuckahoe, New York, where he lived until December 13th, 1901. In December, 1901, his wife decided to go back to her people. She gave as her reason that he was out of work and there were no prospects of his getting work, and she was going home to stay until he got work. He protested against her going, but she gave him to understand that it was more or less of a visit; that she would return when he got something to do. As soon as he got something to do, inside of three weeks, he went to Wassaic to see her, having in the meantime written to her twice, but he did not receive any letters from her in the meantime. He found her at the home of her sister, Mrs. John Bates. He went to make arrangements for her to come back. He then learned for the first time that she had no intention of coming back. She said that she did not have any intention of doing so, and that she did not when she went away. He attempted to plead with her but it made no impression, and she finally asked her brother-in-law, Mr. Bates, to invite him to leave the house. The last thing he said was, 'Was there not something he could do so that she would come back?' and she said 'absolutely none,' she had made up her mind not to go back, and she then requested her brother-in-law to ask him to leave the house, which he did. From Tuckahoe he went to Yonkers, staying with his aunt. He wrote her every week, sometimes twice a week, but he did not receive any letters in answer. He continued writing her from two years and wrote easily over two hundred letters in that time. He sent a doctor in Yonkers to see her. The doctor really went on his own hook, because the petitioner was quite sick and the doctor said it was that that was making him sick, and he was going to see what he could do. The doctor reported to him and said that it was absolutely hopeless; that they would not talk with him and that there was no reason to expect her to come back. That doctor is now at Saranac Lake, with tuberculosis. He

also sent his aunt twice, with the same result. She is now dead. He also sent a Mr. Wills.

"He came to Newark, New Jersey, to live, in the early part of 1915, January or February, but he thinks in the latter part of January, and he has lived there ever since.

"When he came to New Jersey he wrote to his wife almost immediately. He has not a copy of the letter he wrote, as all his personal belongings were destroyed when he went into the service of the United States. Many of his letters were returned, marked 'Refused, return to writer.' The letter that he wrote in the early part of 1915 did not come back, but it had a return card in the upper left-hand corner. He has never had any response to these letters.

"In the late summer, or early fall of 1920, he sent Mr. Charles M. Wills to see her. Mr. Wills testified that in the fall of 1920 the petitioner explained to him, in a general way, his marital difficulties, told him that he was anxious to effect a reconciliation with his wife, and asked him to approach the defendant and endeavor to persuade her to return to him. Mr. Wills went to Wassaic, New York, located the defendant, and said it was the desire of the petitioner to effect a reconciliation with her and have her return to live with him. The defendant told Mr. Wills that if the petitioner sent him there with any idea that she would agree to return to him that it was wasting his time, the witness' time and hers; that she had been separated from the petitioner a number of years; that he had completely gone out of her mind and that the visit of Mr. Wills was the only thing that would probably recall it to her mind. She stated that under no circumstances would she consent to a reconciliation or consent to see the petitioner. Mr. Wills told her that he was going to remain in the town until late in the afternoon; that he would like it very much if she would give this matter some thought; that he would be within call until the train left, and if there was any change in her mind all she had to do was step to the door and call him. She answered that he could go because she would not call him, and he could convey to the petitioner the message that she would never return to

50

him, and that the divorce courts were open to him if he so chose. He then told her that he would report to Mr. Buckley as follows: 'I have used all of my power and persuasion to induce your wife to return to you but she absolutely refuses, and her message to you is that this is final, and that the divorce courts are open to you if you so desire,' and she answered, 'that will cover the situation completely.'

"I am unable to agree with the special master in this case.

"I think that the defendant deserted the petitioner in 1901, in the State of New York; that the desertion became complete in that state in December, 1903; that the petitioner did not become a resident of New Jersey until January, 1915, and that he was obliged to establish the fact that desertion, it having subsisted in this state for two years prior to the filing of the petition, was a good ground for divorce in New York in December, 1903.

"I understand this to be the conclusion of Vice-Chancellor Emery in *Koch v. Koch, 79 N. J. Eq. 24; vide 2 Comp. Stat. p. 2032 § 7(b); Getz v. Getz, 81 N. J. Eq. 465; Berger v. Berger, 89 N. J. Eq. 430; Flynn v. Flynn, 83 N. J. Eq. 690.*

"Where there is a desertion in another state, the petitioner must prove either that he came to New Jersey to live before the desertion accrued and remained in this state for the statutory period, during all of which time the desertion continued, or else he must prove, as above stated, that he came to New Jersey after the desertion accrued and that the desertion has continued for two years thereafter, and that desertion was a good ground for divorce in the state in which the desertion occurred.

"The case of *Orens v. Orens, 88 N. J. Eq. 29,* holds that in causes for divorce for desertion there are two periods of two years each, during which time the desertion must have been willful, continued and obstinate; the first, that immediately succeeding the desertion, at the expiration of which time the cause of action arises and accrues; and the second, that immediately prior to the filing of the petition, which vests the jurisdiction in the court to decree a divorce. *Vide Gordon v. Gordon, 89 N. J. Eq. 535, 538.*

"I think that when the defendant deserted the petitioner in New York, in December, 1901, and refused to return to him, the desertion became willful, continued and obstinate in December, 1903. This all occurred in New York State.

"Counsel for the petitioner seems to think that his position in this case is justified by the case of *Byrne* v. *Byrne 93 N. J. Eq. 5.* Chancellor Walker in that case, citing the case of *Carroll* v. *Carroll, 68 N. J. Eq. 724,* and *Foote* v. *Foote, 71 N. J. Eq. 273, 279,* and referring to the *Carroll Case,* uses the following language: 'The petitioner appealed and the court of errors and appeals reversed the decree in chancery and granted a divorce, observing (at *p. 727*) that it is not necessary to begin a desertion, that the deserter intended to desert at the time he leaves his home; that if the proof shows that he at any time while absent, determined that from thenceforth he would desert his wife, and that determination is persisted in willfully, continuedly and obstinately for the statutory period, that will constitute desertion for the required time.'

"In other words, it holds, as is stated in the third syllabus, the offense is complete, nothwithstanding that an earlier period than the commencement of that period was alleged in the petition as the actual date upon which the desertion commenced, but desertion once commenced must have been continued without interruption to entitle the petitioner to a decree. I do not think that this case holds that, if desertion occurs in another state, and the time accrues while the parties are living out of this state, the petitioner can come into this state after that time and obtain a divorce unless he can show that desertion was a ground for divorce in the former state. Parties seem to think that they can allege the desertion to have occurred at any time they wish. This, of course, is subject to proof, that it did occur at the time alleged. If this were the law, any defendant could desert the petitioner in a state where desertion was not a good ground for divorce, the time could accrue in that state, the petitioner could come into this state, reside here for two years, immediately write and ask his wife to return to him, and upon a refusal or neglect

so to do, as in this case, say that the desertion occurred in New Jersey. It would be an easy way to evade our law, and it would furnish a fertile field for fraud.

"The case of *Garrett* v. *Garrett, 86 N. J. Eq. 293,* holds that it is an inflexible rule that a divorce will not be granted upon the uncorroborated testimony or admission of a party to a suit, and that this applies to every element in the suit necessary to sustain it.

"If the desertion occurred in New York in 1901, I do not think that it has been corroborated, for the petitioner alone testified to it. I look upon the letter written by the petitioner to the defendant, in the early part of 1915, as an attempt to have his wife return to him. It is a rule that where the wife leaves her husband, it is his duty to use every effort to induce here to return to him, and that this must be corroborated. *Sterling* v. *Sterling, 71 N. J. Eq. 59.* This is necessary unless it is clear that any effort in that direction by the husband would be unavailing to terminate the desertion. *Marsh* v. *Marsh, 86 N. J. Eq. 419.* All of these matters must be corroborated by the best evidence. *Lasker* v. *Lasker, 91 N. J. Eq. 352.*

"The only evidence in this case to establish the fact that the petitioner tried to induce his wife to return to him, aside from his own testimony, is that of his aunt, who is now dead, that of a doctor, who cannot be produced, and that he, the petitioner, wrote many letters to his wife, which were either not returned or were returned with the mark 'Refused' on them. None of the letters are produced, nor is their content sworn to by any person except the petitioner. This, of course, does not refer to the letter written in the early part of 1915. It follows that in all of the above matters the petitioner is not corroborated. With regard to the last-named letter, he testified that in the spring of 1915 he wrote to his wife, asking her to return to him; that he had no copy of the letter, all of his personal belongings having been destroyed when he went into the service of the United States; that the letter was not returned to him, although he had a return card in the upper left-hand corner, and that he had

no response to it. He swore to the contents of this letter—swore that he sent it. Mr. Wills swears that he went to see the defendant in the fall of 1920, and that she admitted receiving a letter from the petitioner in Newark asking her to return to him. I am willing to assume from this that there is a corroboration of his having written this letter from Newark and of its contents. *Orens* v. *Orens, supra*. Mr. Wills swears that he went to Wassaic, New York, in the fall of 1920, at the request of the petitioner, saw the defendant and requested her to return to the petitioner, and that she absolutely refused to do it.

"The petition in this case was filed November 29th, 1920. It seems to me that Mr. Wills' journey to Wassaic, New York, in the fall of 1920, was intended to create a status so that the petitioner could sustain an application for divorce. It has the appearance of not being *bona fide*. *Arrowsmith* v. *Arrowsmith, 71 Atl. Rep. 702, 704.*

"It seems to me that this entire case has proceeded upon the theory that the desertion occurred in 1901. The master asked the petitioner what reason he could give, if any, for his wife leaving him in 1901, and he answered: 'I can give none. I might say this, that about three generations back there was a family feud, but it had nothing to do with either of us.' He was then asked if she had ever expressed her intention to leave him before she finally left, and he answered: 'None whatever.' Charles M. Wills swore that Captain Buckley asked him to see his wife in an endeavor to have her return. He was asked by the master if the defendant gave any reason for her original leaving of Captain Buckley, or any reason for her refusing to live with him, and he answered that she did not. The master also asked Frank H. Buckley where John H. Buckley was living when his wife left him, and he answered: 'Tuckahoe, New York.'

"It is my opinion that the desertion occurred in Tuckahoe, New York, in December, 1901, and became complete in December, 1903, in that state, and that the petitioner, to sustain a suit for divorce in this state, he having come here to

live in 1915, must show that desertion was a good cause for divorce in New York in 1903.

"In my opinion a decree should be entered advising that the petition should be dismissed."

*Mr. Fred Herrigel, Jr.,* for the appellant.

PER CURIAM.

The decree under review herein is affirmed by an equally divided court.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, MINTURN, KATZENBACH, CAMPBELL, WHITE—6.

*For reversal*—PARKER, KALISCH, BLACK, GARDNER, VAN BUSKIRK, CLARK—6.